Page 13

(1) A It was pro bono. It was a proponent for (2) appropriate acoustics in the educational setting.
(3) Q Okay. Were they working on a minimum (4) guideline or anything?
(5) A We were, yes. We developed a standard –
(6) Q Who is "we"?
(7) A – an ANSI standard. The United States (8) Access Board. Lois Tibolt is who I worked with.
(9) Q Lois Tibolt?
(10) A Yes. As well as the Acoustical Society of (11) America and because my circumstances as a hard-of- (12) hearing architect, I was a great candidate to help (13) represent that.
(14) Q Were you on an advisory committee or was (15) it just a freelance –
(16) A Yes. I was on the Working Committee.
(17) Q The Working Committee. Okay.
(18) A And I traveled and would give talks about (19) the benefits of appropriate acoustics.
(20) Q Okay. So you are familiar with – you (21) mentioned the ANSI standard.
(22) A Yes.

Page 14
(1) Q Okay. And do you know if that applies to (2) public schools in general?
(3) A Oh, yes.
(4) Q Do you know which one it is?
(5) A Well, I know that we implemented the (6) standard in our design guidelines with DCPS as well as (7) to date, I think 11 states have adopted it.
(8) Q Okay. Do you know what the Uniform (9) Federal Accessibility Standard you were assigned to? (10) Have you heard of that?
(11) A No, I haven't.
(12) Q Okay.
(13) A Can you repeat that?
(14) Q I asked you if you were familiar with the (15) Uniform Federal Accessibility Standard and you said (16) you never heard of that.
(17) A The Uniform Federal Accessibility (18) Standard.
(19) Q The Uniform Federal Accessibility (20) Standard.
(21) A No.
(22) Q No, you're not familiar with it?

Page 15
(1) A No. I went by the Americans With (2) Disabilities Act and those guidelines that were (3) provided by the United States Access Board.
(4) Q But the Uniform Federal Accessibility (5) Standard is not part of those guidelines to your (6) knowledge?
(7) A It hasn't been brought to my attention in (8) the past. I don't know whether if it is or not.
(9) Q You sound like you've never heard of it?
(10) A I haven't.
(11) Q Okay. Okay. Now, I have received an (12) email from Mr. Bruckheim which is not attacking what (13) we're going to put in evidence here, but he states in (14) here that you were present at Ballou High School on (15) September 3, 2003.
(16) A Yes.
(17) Q Okay. Is that your calendar from 2003 (18) that you're looking –
(19) A Um-hmm.
(20) Q Okay.
(21) A Yes. I had a site visit.
(22) Q We'll come back to that in a second.

Page 16
(1) A Okay.
(2) Q Is the calendar the only document that you (3) brought with you today in response to the subpoena (4) that we served you?
(5) A Yes. It was the only thing I could find.
(6) Q Okay. Fair enough.
(7) A I had left all of my documentation with (8) the District because it is their property.
(9) Q Okay. Fair enough. Can you tell me if (10) you were ever at Ballou before September 3rd?
(11) A Yes.
(12) Q You were?
(13) A I'm certain.
(14) Q Can you tell me when? Take your time. (15) I'm not going to rush you.
(16) A August.
(17) Q August when?
(18) A Eleventh and then again on the twelfth, (19) the fourth, the fifth, the eighth, the twenty-eighth (20) of July. I'm going backwards. I apologize.
(21) Q That's fine. That's fine.
(22) A The twenty-ninth of July, twenty-second of

### Page 109

(1) **A Yes.**
(2) Q Okay. But you – this mentions the (3) bathroom and the health suite, but you said you never (4) went into the health suite?
(5) **A I'm just not remembering it.**
(6) Q Very good.
(7) **A I'm sure that I've been in there. There** (8) **aren't many places in that school that I haven't been.**
(9) Q Okay. And when you went to Mrs. Gordon's (10) room – you said it was 112 was the only one you went (11) into – did you also look at the shelving?
(12) **A No.**
(13) Q And you didn't do any work on that?
(14) **A That wasn't something that –**
(15) Q Your report doesn't show any work on that. (16) Is that correct?
(17) **A Right.**
(18) Q Okay. Never mind, then.
(19) **A I'm not remembering.**
(20) Q Now, you said you had a recollection of a (21) copier. That sort of rang a bell.
(22) **A Well, that's what rang the bell when I got**

### Page 110

(1) **down to the bottom here.**
(2) Q Okay. What's your recollection of that?
(3) **A Just that she had access to a copier.**
(4) Q Where was it as best you recall?
(5) **A In the office, which is right here.**
(6) Q When you say she had access in the office, (7) would be good enough to identify on the map where the (8) – the number of the office to which –
(9) **A The main office is room number 260.**
(10) Q Number 260 on the map that we've (11) identified as an Exhibit.
(12) **A Yes. It's right around the corner.**
(13) Q Right around the corner.
(14) **A From her class.**
(15) Q Do you know how far it was offhand, (16) approximately? If you don't know –
(17) **A Fifty feet, sixty feet maybe. You just** (18) **had to walk through the main lobby and the office is** (19) **right on the right.**
(20) Q Okay. We don't need this document. We're (21) not going to mark it. Let's see what else I have (22) here. I just want to separate these out.

### Page 111

(1) Unfortunately our collator failed. I apologize for a (2) moment. I'm going to show you a document dated August (3) 29th.
(4) (Whereupon, the foregoing matter (5) went off the record, briefly.)
(6) MR. GORDON: Okay. Back on the record.
(7) BY MR. GORDON:
(8) Q Have you ever seen the document I'm (9) showing you dated August 29, 2003 –
(10) **A No.**
(11) Q – from Murielene Gordon to Dr. Bridges?
(12) **A No.**
(13) Q Okay. Did you recall having any (14) conversations with Dr. Bridges on or about August 29, (15) 2003 relating to Murielene Gordon?
(16) **A I can't recall.**
(17) Q Okay. You don't know anything about it so (18) we don't need that one. I'm going to show you that (19) one, too, in case we need it. Have you ever seen this (20) document, also dated August 29th?
(21) MR. GORDON: And this one, we'll mark it - (22) - what exhibit are we up to?

### Page 112

(1) THE COURT REPORTER: Four.
(2) MR. GORDON: Four.
(3) (Whereupon, the document (4) referred to above was marked (5) for Identification as (6) Plaintiff's Exhibit No. 4.)
(7) THE WITNESS: No.
(8) BY MR. GORDON:
(9) Q Okay. And you've had a chance to review - (10) -
(11) **A No. I never saw this.**
(12) Q Okay. Let me ask you –
(13) **A But I am remembering hearing about it.**
(14) Q You heard about this one.
(15) **A Yes.**
(16) Q What did you hear about it?
(17) **A "When are the changes going to be done?** (18) **Mrs. Gordon needs them."**
(19) Q Okay. Who said that to you?
(20) **A Dr. Bridges.**
(21) Q Okay.
(22) **A And a lot of these things, he was probably**

## Page 129

(1) I don't want to go near. And when was the last time (2) you were in Ballou prior to being subpoenaed?
(3) **A I think it was December of 2003.**
(4) Q And what was the occasion for that visit?
(5) **A I have it in here. I had found it in here** (6) **and now I've lost it. Oh. It was the auto technology** (7) **shop certification meeting.**
(8) Q Okay. Did you see Mrs. Gordon at that (9) time?
(10) **A No.**
(11) Q Did you have any conversations regarding (12) Mrs. Gordon with Mr. Atkinson?
(13) **A As the three of us?**
(14) Q Just did you and Mr. Atkinson, whether or (15) not a third person was present, have any conversation (16) regarding Murielene Gordon?
(17) **A Other than -- I think the only** (18) **conversation that I had with Mr. Atkinson were the** (19) **specific needs that she had.**
(20) Q And when was that conversation?
(21) **A I don't know.**
(22) Q Give me your best guess.

## Page 130

(1) **A Sometime between May and September.**
(2) MR. BRUCKHEIM: Of 2003?
(3) THE WITNESS: Yes.
(4) BY MR. GORDON:
(5) Q Okay. Did you ever have a conversation (6) with Mr. Hamlin? Do you know who Mr. Hamlin is?
(7) **A I know Dr. Price. I'm not recollecting.**
(8) Q Okay. Fair enough.
(9) **A If I saw his face.**
(10) Q Okay. He's one of the people who did (11) custodial work around the building. Does that help (12) you?
(13) **A Oh. Is he a younger fellow? Really tall?**
(14) Q I can't --
(15) **A If I saw his face, then, yes.**
(16) Q Okay. But you don't recall a specific (17) conversation?
(18) **A No.**
(19) Q How about Dr. Gross? Any conversation (20) with Dr. Gross about Mrs. Gordon or providing (21) accessibility in her room?
(22) **A I think Dr. Gross came into the picture**

## Page 131

(1) **right after that.**
(2) Q When did Dr. Gross come into the picture?
(3) **A Is he an assistant superintendent?**
(4) Q No. He's an assistant principal.
(5) **A Oh. Okay. It came back to me.**
(6) Q Lightbulb moment.
(7) **A Yes. Just had to place him. Most of my** (8) **conversations were with Dr. Bridges. I might have had** (9) **a brief conversation with Dr. Gross about it just to** (10) **let him know what I was doing.**
(11) Q Okay. How about Mrs. Gordon?
(12) **A Yes.**
(13) Q Or in general?
(14) **A In general, because they always would come** (15) **to me because I knew about all the little different** (16) **things that were going on in the school, so I very** (17) **well could've had a conversation, a brief** (18) **conversation, with him about Mrs. Gordon.**
(19) Q Do you recall any specific conversation (20) you had with him?
(21) **A About Mrs. Gordon?**
(22) Q About Mrs. Gordon or making her room

## Page 132

(1) accessible, or meeting her needs for accessibility?
(2) **A I think so.**
(3) Q Tell me what it was. Tell me the (4) conversation.
(5) **A Explanation of what we were doing.**
(6) Q Okay. Did you create a document about (7) that conversation?
(8) **A The main document would've been that scope** (9) **of work.**
(10) Q Okay. And I understand that.
(11) **A Yes. And no documents pertaining to the** (12) **specific conversation with Dr. Gross, no.**
(13) Q When I refer to conversation with Mr. (14) Atkinson, I said Mrs. Gordon. I also meant about her (15) room or meeting her needs.
(16) **A Right.**
(17) Q All those would've been in that same time (18) period of May to --
(19) **A Right.**
(20) Q Rather than rehashing three different (21) questions.
(22) **A Right. See, I wouldn't spend a whole lot**