Gordon v. District of Columbia, No.05-1907 (EGS)

# Exhibit 2

## Affidavit

Murielene Gordon, under penalty pursuant to Title 18, United States Code and the applicable laws of the District of Columbia deposes and says:

I am the Plaintiff in the suit Gordon v. District of Columbia, Civil No. 05-1907.

I have taught art at Ballou Senior High School since 1990. I was assigned room 111 (no. 197 on Exhibit 1) and then to room 112 (no. 198 on Exhibit 1) until the time I retired in January, 2006. Neither classroom are air conditioned.

In each classroom, there are emergency exit doors, which open to concrete that leads directly to the front of the school (4th Street, S.E. entrance). The emergency exit doors in room 111 were regularly locked and chained as shown on photographs that were previously submitted. I felt scared, afraid that because of my disability and the problems it meant for me when I walked, I would not be able to get out of Ballou in a real emergency.

The photographs that were submitted to the Court were taken by me, or they were taken in my presence and direction by either by daughter or former students. These photographs are the conditions at Ballou. Among the photographs, that my daughter took, are photos of the rest rooms at Ballou, and storage room shelves on which I was to put my art supplies. Even though I am 5'9", (though I stoop over because of my arthritis and other health issues), I could not reach and use most of the shelves, especially the top shelves.

On September 1, 2001, I lost my classroom key. I dropped it and it fell down a storm drain in the North Parking Lot at Ballou. This key was not replaced until three months later. Since this key opened my classroom door, and the door to the teacher's rest room (no. 239 on Ex. 1), I had no access to the teachers' rest room during this time, except if I could get someone to let me in. The seat in the teacher's rest room was too low for me. It is about 16 inches off the ground. The door to the stall is quite narrow. (I am not sure if I could pass through it with my walker if I had to use it today.) The handles on the sink were regular handles, not levered.

At my request, my daughter took the pictures of this rest room that were submitted to the Court. Those particular photographs were taken in
June, 2003, when I went to Ballou, in connection with my return, it looked this same way when I retired in 2006.

At the time I lost my key to my classroom in 2001, the health suite (no.237 on Ex.1) had two locks. I did not have a key to the health suite and unless someone was inside the suite, I couldn't get in. Sometimes the nurse was out tending to students or others in need of help. Sometimes I called the office on the school intercom to get coverage of my class if I needed to go the rest room. I never got the coverage. Because of all this, I could not drink fluids, as I was afraid I would have to urinate. In fact, I had accidents though I did not tell the school administration. I felt embarrassed and frustrated. I felt it would not do any good considering how non-responsive Dr. Bridge, and others in the school, had been on the heating concerns on which many memos were sent him with no response.

Since I had no key, I couldn't lock my classroom door, therefore, I had to take all of my personal property with me whenever I left my classroom. Although I offered to go to the locksmith up the street on Martin Luther King Jr. Ave, two blocks away, and get another key made, I was told no. This situation lasted three months before I finally received another key.

Defendant, particularly Dr. Bridges was well aware that I had a disability and that things needed to be done in my classroom because of my health impairment. Conditions in my classroom were too cold in the winter and too hot in the spring and summer months. This has been known to the Defendant since 1999 from numerous communications. In January, 2000, my students put in a petition to school officials about our classroom conditions. (See Exhibit 4) Memoranda were sent periodically to Ballou administrators, including Dr. Bridges. There was no substantive response. When I would inquire of Dr. Bridges, he would say something like "we're working on it" or something else that was not substantive, such as "I will get back to you". Neither Dr. Bridges nor anyone else ever responded to the memos or got back to me. In fact, in October, 2002, Ballou principal, Dr. Bridges telephoned me and asked me to send him all the various documents related to the temperature in my room. I sent him a full package, Exhibit 4. Again, there was no response. Because Dr. Bridges was so non-responsive to my concerns about the lack of heat in my classroom, I bought supplies and got students to duct tape heavy plastic on the windows to keep out the cold. This is shown in some of the pictures submitted to the Court RULE26PHOTOS 1-5

During the 2001-02 school year, badly needed, new art tables were ordered for my classroom. Although they were clearly marked, ART TABLES, the boxes were delivered to the school cafeteria. Dr. Bridges and administrators did not have the art tables delivered to my classroom, even though they normally deliver materials to other teachers when their supplies/equipment arrived. It was weeks before I learned that the tables were stacked up in the cafeteria. When I finally learned about the tables' arrival, other teachers innocently had helped themselves to the new tables to use in their classrooms. Maintenance refused to transport the tables to my classroom. Eventually, I got my students to help me take the remaining art tables to my classroom and assemble them.

During 1999-2002 in addition to the problems with emergency exits, shelves, rest rooms, and heating, I requested that the school administrators consider the fact that I could not climb stairs and therefore to relocate staff meetings and other committee teacher meetings to the first floor. I requested a key to the elevator but never received one. Every now and then, but not all the time, a meeting would be on the first floor.

I have degenerative arthritis and during 2002-03, I walked with a cane. During this period I was also in treatment (including surgery and post-operative therapy) for problems with my knee. I provided documentation to the Defendant in this regard, particularly since I had to borrow leave from the Washington Teachers Union sick leave bank. Also, I had spoken with Dr. Art Bridges, principal of Ballou Senior High School, about my condition. In July, 2002, I mailed him, first class mail, postage prepaid, medical information relating to my diagnosis and prognosis. (Exhibit 10)

On or about August 9, 2002, I had a telephone conversation with Principal Bridges in which I told him I would not be returning to Ballou for the start of the new school year due to my

health problems. At this time, Dr. Bridges told me "I was a liability at Ballou" and that I should "sit tight" and that he would transfer me. He said that I could not run out of Ballou if there was a fire.

On September 16, 2002, I faxed Dr. Bridges information that my sick leave bank request had been approved by the Washington Teachers Union. I also called Dr. Bridges and inquired as to my status. Dr. Bridges informed me that he was going "downtown" to fill out the transfer. At this time, I had also told him that, in spite of the fact that my legs were affected by my health problems, my brain was in great shape. I recall telling him that I may not be able to run out of the building in case of a fire (as he suggested), but if I had a key to unlock the exit doors in my classroom, I would not have to "run out of the building". He did not respond. He hung up.

On September 25th, I was again in contact with Dr. Bridges. Subsequently, at his request, I provided him with copies of correspondence he had previously received regarding the lack of heat in my classroom (Exhibit 4). There was no reply.

By November, 2002, I had not heard from Dr. Bridges so, I tried on multiple occasions, at least twice, sometimes three times a week to reach Dr. Bridges about my return to work and/or transfer. Several times when I called I was told that Dr. Bridges was out of the building. Other times I was told that he was in a meeting and would be given the message that I called. When I called Ballou and was told that Dr. Bridges was out or in a meeting, I always left a message for him to call me. One time when I called and stated that it was "Mrs. Gordon calling to speak with Dr. Bridges", the person who answered (female, I believe) hung up on me.

In the Fall, 2002, in spite of multiple, unsuccessful efforts to reach Dr. Bridges, I called downtown to DCPS headquarters. I talked with someone in Personnel and was told that there were no vacancies for art teachers. I also tried to find out from other divisions of DCPS Human Resources what, if anything, Dr. Bridges had done in terms of filling out paperwork so that I could learn my status. I was unsuccessful, the individuals I was referred to were out, and their telephone mailboxes were full therefore, I could not leave messages the numerous times I called.

I thought of going to Ballou but I had not been able to reach Dr. Bridges to make an appointment. I do not drive and getting to Ballou is difficult. It can take up to two hours from my home by bus. It would take three or four buses to Ballou. There are special Metro buses with ramps for persons with disabilities which I needed for transportation. During "rush hour", it regularly took me over an hour and a half to get to Ballou. I was afraid of waiting all day for Dr. Bridges if he was not in the building or a confrontation with Dr. Bridges. I have seen Dr. Bridges have "in your face" confrontations with other teachers. I did not wish to make my health worse, particularly my high blood pressure and thyroid condition.

At this time I asked my daughter, Michelle, to try and call on my behalf. In her own affidavit, she states what she did, which proved fruitless. He never called me back and to my knowledge, he never called her back. I remember calling Dr. Bridges on December 11, 2002, to

ask him about returning to work/being transferred and was told that he was in a meeting. I left a message for him to call me back. He did not.

On December 18, 2002, I called about returning to work/being transferred and was told that he was out of the building and the person answering did not know when he would return. I left a message for him to call me back. He did not. My daughter called and got the same story at this time

In January 2003, I continued to try to contact Dr. Bridges. Usually the persons I spoke with were persons who did not give their names, some were students who worked in the office, other times it was female administrative type persons who would answer and I would request to leave a message for Dr. Bridges to call me.

On January 28, 2003, Dr. Bridges finally contacted me. It was about my negative sick leave balance. A few days before, I had received a document from DCPS about a negative sick leave balance. I returned it to DCPS with a note on the form to contact Dr. Bridges since he had all the answers about my status.

At this time, January, 2003, I reminded Dr. Bridges about his remarks to me that I was a "liability" (from August, 2002), and that he was going to fill out papers for my transfer. I also told him that I had been trying to contact him and leaving messages for him to call me about my status. Dr. Bridges, at this time, began to admonish me, cursed me, and angrily said that if I complained further I would be put on AWOL and not receive a paycheck. Then he cursed me again and hung up. I was hurt, confused and angry that he would disrespect me and treat me this way.

In early February, 2003, I contacted the EEOC, Exhibit 14, and a few weeks later filed an internal complaint of disability discrimination with DCPS, seeking accommodations and a transfer, Exhibit 15. I was not interviewed or contacted, Exhibit 17.

In late February, I was notified that I was being put on AWOL, Exhibit 26. At the same time I filed an internal complaint with DCPS, Exhibit 15. I wrote Dr. Bridges on March 3, 20003 (sic 2003) requesting reasonable accommodations, Exhibit 16.

After Defendant (DCPS) closed my internal complaint without contacting me, Exhibit 17, I finalized my complaint with the EEOC. Defendant's Renewed Motion, Exhibit 2.

After I filed my EEOC complaint, Defendant had me undergo a fitness for duty examination which led to their doctor recommending accommodations for me. In turn, this led to a meeting at Ballou about accommodations following which Defendant's Labor Relations Counsel documented accommodations Ballou was to implement, Exhibit 20. I saw Dr. Bridges in the building and was hurt that, as my supervisor, he did not attend and participate in such an important meeting, Exhibit 21.

At the meeting at Ballou in June, 2003, I learned that my art supplies that I purchased, my art books, my coat that I wore when my room was cold (I kept a spare coat for any student who was cold and needed it) that had been in the storage room in room 111, had been thrown in the trash, discarded. Id.

I returned to Ballou for the 2003-2004 school year. Unfortunately the problems and hostility continued.

When I returned I was assigned to a Reading Group which met in Room 205, Exhibit 23. I did not have an elevator key, was using a cane at this time, and could not ambulate the stairs. I did not attend, missing the interaction with my colleagues as well any information.

The temperature problems continued, as seen in the memoranda previously filed with my experts' statements, and filed here as Exhibit 24, being as hot as 85 degrees in fall and 42 degrees in winter.

I was given a key to the health suite. However, there were two locks and my key only fit one, Exhibit 8, 9. I was still dependent upon someone being there to let me in to use the health suite rest room. The teachers' rest room remained unchanged, with the low toilet seat and knobs that are difficult for me to use because of my arthritis. Again, could not drink fluids, not even a cup of tea or a soft drink with my lunch because of the uncertainty of whether or not there would be a rest room I could use. I held my urine and sometimes had accidents.

When I returned to Ballou, I was assigned to room 112 (no. 198 Exhibit 1). Just like my old classroom (room 111), the exit doors within this classroom led to the street. These doors were constantly locked, as the photographs previously confirm. The doors were locked from the time I taught in this classroom until I retired in January, 2006. I never received a key to unlock these doors. Also, there was no safety mat under the sink. A mat was ordered in summer 2003 but did not arrive until December, 2005, about a month before I retired.

Dr. Bridges' hostility toward me continued. In December, 2003, he berated me, at length, in a classroom filled with my students. A student, a senior with a half day schedule, offered to purchase my lunch outside the school and bring it back to me before he went to his job. The security officials would not let him back in the building and they wouldn't take the lunch to me, so, he attempted to pass me my lunch via the window. Dr. Bridges came into my classroom cursing and getting into my face publicly humiliating me in front of a classroom of students. I wrote him a memo giving him the facts of what happened including, the student's name who tried to help me but, Dr. Bridges did not respond.

In February, 2004, the chair I sat on in my classroom, room 112, broke and I fell to the floor. It was during my planning period so my classroom was empty and the door was locked. Eventually, using my cane, I managed to get someone on the outside to get help. Dr. Bridges was informed and he came into the classroom and refused to replace the broken chair. He told me that there were no chairs in the school and that I should bring one from home. He did not ask me if I was hurt. Instead, he berated me for locking my door. Shortly after this incident, my desk broke and I had to work out of cardboard boxes. My students found a desk and chair for me in other vacant classrooms and bought them to me in room 112. I was upset and hurt by how I was treated by Dr. Bridges and his staff. I felt like a non-person in the eyes of the school administrators.

In September, 2005, this lawsuit was filed. In November, 2005, I was directed to attend training on the second floor of Ballou Exhibit 25. I was using a walker, did not have an elevator key and could not use the stairs. I missed the training.

Respectfully submitted,

*[signature: Murielene E Gordon]*

Murielene Gordon

Dated: 2/4/2008

**Attestation**

On this __4th__ day of February, 2008. I have made the foregoing affidavit, voluntarily, under penalty of perjury pursuant of perjury to Title 28 United States Code and the applicable laws of the District of Columbia. Signed Murielene Gordon