Gordon v. District of Columbia, No.05-1907 (EGS)

# Exhibit 11

# Affidavit

I, Michelle Rennie, reside at 2400 Queen Chapel Road, #614, HyattsvilleMD 20782 and make this Affidavit, under penalty of perjury pursuant to the laws of the District of Columbia and the State of Maryland, voluntarily, without compensation or the promise or expectation thereof.

I am the daughter of Murielene Gordon, who resides at 1022 Bryant Street, N.E., Washington, the Plaintiff in Gordon v. District of Columbia, United States District Court, District of Columbia Civil No. 05-1907.

During the period of April 2002 – April 2003, my mother had significant health problems which affected major life activities. She was ambulatory impaired due to her arthritis and knee surgery. In addition to these health problems, my mother slipped an fell on some food that students dropped in the hallway at school. The fall caused additional pain and walking problems for her. At the time my mother used a cane and did not ambulate like the typical able bodied person. She was noticeably slower and more cautious in walking because of the pain in her knees and hips. While I could walk down her steps in a minute or two, it was impossible for her to do so in less than ten minutes. Any task that required the climbing of stairs, lifting, reaching, pushing, or pulling would be done by my nephew, her grandson, who lives with her. My mother did as much as she was physically able to do on the first floor and my nephew would have the tasks of doing the rest of the chores. She was in constant pain. Unlike the typical able bodied person in this society, ,my mother had to avoid walking or being mobile whenever she could.

My mother was an art teacher at Ballou Senior High School and during the school year 2002-03 she was unable to start her teaching duties because she was recovering from medical complications relating to her knees. This was painful for my mother because she loved her work and she always looked forward to the new school year to teach her students. I would help her during the summer months by copying lessons and purchasing much needed art materials and supplies for her students.

Over the summer, I believe in August 2002, my mother tearfully told me that Dr. Bridges had told her that she was a "liability" and that he was going to have her transferred to another school. She was crushed and very hurt. I was shocked and appalled at such a statement being made to my mother. I thought of all the

times she would stay late at the school with her students painting murals on the walls or putting up artwork in the halls to decorate the school. My mother put so much of herself into Ballou, year after year. She did not deserve this kind of treatment and disrespect.

In September 2002, my mother told me that Dr. Bridges told her to "sit tight", that he was going "downtown" or to the "Central Office" to write up the paperwork for a transfer. I came to my mother's house virtually every day and when I did, she was stressed out, depressed, about trying to contact Dr. Bridges so that he could tell her about coming back to work. She was never able to reach him. Adding insult to injury, the individuals in the main office at Ballou would sometimes hang up on her when she tried to ask for Dr. Bridges. This type of disrespect and disregard hurt her a great deal.

I tried to help her by volunteering to call Dr. Bridges. I started calling Ballou, asking to speak with Dr. Bridges about my mother in late September and continued periodically over the next several months, all in vain. I remember one of the occasions was in October, the day after my daughter's birthday celebration, October 13th. I called three times and each time I was told that Dr. Bridges was out of the building. I politely left my name and telephone number, asking that he please return the call, also stating that I was calling on behalf of my mother, Ms. Gordon. He never called me or my mother back. I continued to call, sometimes two and three times a week. I was told by an administrative assistant type staff person, the same things my mother had told me, namely that Dr. Bridges was out of the office or out of the building. Each time I would ask the staff to leave a message for Dr. Bridges to call my mother back about her returning to work at Ballou or her transfer. When I talked with my mother to find out if she had been contacted, the answer was always, no. I never received a call from Dr. Bridges, either.

I remember calling Dr. Bridges again on December 19, 2002. I remember this date because my boss was giving a holiday party for the staff and I was trying to organize the party. I was trying to organize the party and call Ballou to speak with Dr. Bridges. However, according to the staff there, he was never there and I left messages for him to contact me or my mother. He never returned my calls that day. My mother told me that Dr. Bridges did not call her back either.

Since there was no response from Dr. Bridges, I waited until after the Christmas holidays to continue calling. I again called Dr. Bridges in January 2003, shortly after students returned from their Christmas holiday. My mother as well as

myself was very anxious to find out about her status at Ballou or her transfer to another school. A person, who sounded like a student, answered the telephone and told me that Dr. Bridges was in a meeting and would be in meetings all day. I left a message but did not receive a call back nor did he contact my mother.

I witnessed how the stress and frustration affected my mother and her health. My mother told me that the staff at Ballou would hang up on her when they recognized her voice when she called Dr. Bridges. I saw the hurt and confusion when Dr. Bridges did not take the time to call her back. She was a dedicated teacher who deserved the respect of a single telephone call from Dr. Bridges to let her know her status as a teacher and as a human being.

I have periodically helped out my mother in her classroom at Ballou. I would help out by moving things in her classroom so that she did not have to be mobile. I would organize things in her classroom so that she could easily reach materials. In her storage room, I would get materials from the higher shelves that she could not reach. I also helped her take some of the photographs she has submitted to the Court. Among the ones I took are the photographs of her in the teacher's bathroom. This bathroom was not wide enough for a wheelchair or a walker. Also, it has a low toilet seat. I took the photograph, showing the high shelves in her storage room, which contained art supplies that she could not reach. I believe my mother took other pictures and sometimes got her students, including former students to take some of the other pictures.

Respectfully submitted,

*[signature]*

Michelle Rennie
Dated:

### ATTESTATION

I, Michelle Rennie, made the foregoing affidavit, voluntarily under penalty of perjury pursuant to Title 28, United States Code and the applicable laws of the District of Columbia and the State of Maryland on this 31st day of Jan., 2008.