# Exhibit 1

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MURIELENE GORDON,

        Plaintiff,

v.                                    CA No. 05-1907
                                         (EGS)
DISTRICT OF COLUMBIA,

        Defendant.

June 29, 2006

DEPOSITION OF:

        MURIELENE GORDON

called  for  examination  by  counsel  for  the

Defendant,  pursuant  to  notice,  at  the  law

offices  of  Charles  D.  Goldman,  Suite  1004,

1155 15th Street, Northwest, Washington, D.C.,

at 10:13 a.m., when were present on behalf of

the respective parties:

2

APPEARANCES:

On Behalf of the Plaintiff:

CHARLES D. GOLDMAN, ESQ.
1155 15th Street, N.W.
Suite 1004
Washington, D.C. 20005
(202) 466-7550
(202) 467-5085 FAX

On Behalf of the Defendant:

MICHAEL P. BRUCKHEIM, ESQ.
Assistant Attorney General
Office of the Attorney General
One Judiciary Square
441 4th Street, N.W.
6th Floor - South
Washington, D.C. 20001
(202) 724-6649
(202) 727-3625 FAX

10

1       A    No.

2       Q    Who do you live with?

3       A    My grandson.

4       Q    Okay.    And   how   old   is   your

5    grandson?

6       A    Fifteen.

7       Q    Okay.    Anybody   else   who   lives

8    there with you?

9       A    No.

10      Q    Okay.   What type of house is it?

11      A    Single-family.

12      Q    Okay.   Is it a single level or a

13   colonial, split-level?

14      A    No, they have a basement, first

15   level and second level, second floor.

16      Q    Okay.   Are there stairs --

17      A    And a attic.

18      Q    Oh, I'm sorry.   And an attic too,

19   you say?

20      A    Correct.

21      Q    Okay.    Are   their   stairs   in   the

22   house>

11

1    A    Yes.

2    Q    Okay.    Where is your bedroom

3    located in that house?

4    A    My bedroom?

5    Q    Yes.

6    A    On the second floor.

7    Q    On the second floor?

8    A    Correct.

9    Q    And in order to enter the house,

10    where is the main door located to get in and

11    out of the house?

12    A    I don't understand your question.

13    Q    Is the door to enter the house on

14    the main level of the house, like the first

15    level?

16    A    Yes.

17    Q    You don't have to walk up any

18    steps in order to get into your house?

19    A    Yes, I do.

20    Q    You do?

21    A    Yes.

22    Q    These are steps that are outside?

12

1        A    Yes.

2        Q    Okay.  Do you know how many steps

3   there are outside?

4        A    About 13.

5        Q    About 13?  Okay.  When you walk

6   into your house, would it be fair to say that

7   that would just be the main floor where you

8   walk in?

9        A    Yes.

10        Q    Okay.  Is the kitchen located on

11   that floor?

12        A    Yes.

13        Q    Okay.  Living room?

14        A    Yes.

15        Q    Okay.  Is there a dining room?

16        A    Yes.

17        Q    Okay.  Any other rooms on that

18   floor?

19        A    I have a back porch.

20        Q    A back porch?

21        A    Yes.

22        Q    Okay.  A bathroom located on that

13

1    floor?

2        A    No.

3        Q    Okay.    To get down to the

4    basement, do you have to go down steps to the

5    basement?

6        A    Yes.

7        Q    Okay.  About how many steps?

8        A    I never counted them.  I don't

9    know.

10       Q    Can you hazard a guess?

11       A    No.

12       Q    Would it be more or less steps

13   than the number of steps you have to go up to

14   get into your house?  To the best that you can

15   estimate.

16       A    Probably less.  I'm not sure.

17       Q    Probably less?

18       A    I'm not sure.

19       Q    Okay.  Maybe 10 steps?

20           MR. GOLDMAN:  She says she's not

21   sure.

22           THE WITNESS:  I'm not sure.  I'm

1    going up the steps.  Okay?

2        Q    Okay.

3        A    All right.  I have -- in the back

4    room I have a toilet, one of those portable

5    toilets so I won't have to go up the steps to

6    the rest room.

7        Q    Okay.

8        A    Okay?  I don't go down to the

9    basement.  My grandson -- I -- I hardly ever

10   go to the basement.

11       Q    Okay.

12       A    Because there's nothing down there

13   for me to go down there other than the laundry

14   room.  And usually when I go down to the

15   laundry room, you know, it's not on a daily

16   basis.  Okay?

17       Q    Okay.

18       A    All right.

19       Q    So once you come downstairs in the

20   morning after you get up, you're essentially

21   on that main floor, unless you have to leave

22   the house for whatever reason?

32

1    your employment history --

2         A    Okay.

3         Q    -- it says you were appointed; and

4    correct me if I'm wrong, as a full-time

5    teacher at Spingard High School for 1986 to

6    '89?  Do you see that notation?

7         A    No, I wasn't a full-time teacher.

8    As -- I was probationary, I think.

9         Q    Okay.

10        A    Yes.  I wasn't given full-time

11   status or tenure until what ' 90?  1990, I

12   believe.

13        Q    Until 1990?

14        A    Yes.

15        Q    Okay.  And at that time when you

16   received the full-time status, were you still

17   teaching at Spingard?

18             MR. GOLDMAN:  As best you recall.

19             THE WITNESS:   Best I recall, I

20   think, I was, yes, in '90.

21             BY MR. BRUCKHEIM:

22        Q    Okay.  And on the third page you

1   mention  that  you  began  your  art  teacher

2   position at Ballou in 1990 and continued there

3   until 2006.

4          A     I was transferred, yes.

5          Q     Okay.

6          MR. GOLDMAN:  Counsel, we'll note

7   for the record that in response to one of your

8   interrogatories,  we  gave  you  access  to  her

9   official personnel file.

10         MR. BRUCKHEIM:  I understand.

11         MR.  GOLDMAN:   Okay.   And  we  did

12  that  on  condition  that  we'd  get  a  copy  of

13  that.   I  mean,  I  know  you've  given  me  some

14  documents  recently,  but  I  don't  know  that

15  you've gotten it to turn over to OPF.

16         MR.  BRUCKHEIM:   I  don't  have  the

17  entire  file  in  my  possession.   I'm  asking

18  questions based on information that I have.

19         MR. GOLDMAN:  I'm not saying that.

20  I'm just saying the information you want was

21  already made available to you.

22         MR.  BRUCKHEIM:   I  understand, but

58

1    believe it was on television.

2        Q    Okay.  Did anybody from the office

3    of personnel for D.C. Pubic Schools contact

4    you tell you that Dr. Bridges was fired?

5        A    Why would they do that anyway?

6        Q    That's my point, but I'm asking if

7    they had any contact with you.

8            MR.  GOLDMAN:    Just   answer   his

9    question.

10           THE WITNESS:  No.

11           BY MR. BRUCKHEIM:

12       Q    They did not?  Okay.  Now at this

13   time  you're  no  longer  employed  with  D.C.

14   Public Schools, is that correct?

15       A    I'm retired.

16       Q    Okay.  You retired in January of

17   2006?

18       A    Correct.

19       Q    Okay.       Are    you    currently

20   collecting retirement benefits?

21       A    Correct.

22       Q    Okay.  Can you tell me how much

88

1       Q    I'm talking about between the
2   school years of 2000/2001 to the point when
3   you retired.

4       A    2000?    No, I did not have an
5   opportunity to go around to each table to do
6   this.  They would come to me.

7       Q    Okay.  So you could say then that
8   your job did not require a lot of walking
9   during that time period?

10          MR. GOLDMAN:  Could you define a
11  lot?

12          BY MR. BRUCKHEIM:

13      Q    Did it require walking while you
14  were teaching your class?

15      A    To a certain extent, but no.
16  Well, that's kind of a -- no, because I -- no.
17  No.

18      Q    Because they would come to you?

19      A    I -- what I would do, I set up a
20  table among them and I would demonstrate or
21  whatever needed to be done with the students
22  around me.  Okay?  Because they had little

90

1          MR. BRUCKHEIM:  And beyond.

2          MR. GOLDMAN:  And beyond.  Okay.

3     That's fine.

4          THE WITNESS:  Okay.

5          BY MR. BRUCKHEIM:

6     Q     So  that  would  be  it  did  not

7     require you to do a lot of walking?

8     A     When you say require, I -- I get

9     confused.  Require and was not able to is two

10    different things.

11    Q     Okay.

12    A     I was not able to do it.

13    Q     Okay.  Did the fact that you were

14    not able to do it prevent you from teaching

15    the class?

16    A     From teaching the class?

17    Q     Yes.

18    A     No.

19    Q     Okay.

20    A     I can't say that.

21    Q     Okay.

22    A     I taught the class.

92

1      Q     Did the fact that you were not

2  able to stand for longer than five-minute

3  intervals prevent you from teaching the class?

4      A     You keep saying was not able to

5  teach the class.  I taught my class.

6      Q     I understand that.

7      A     Well then why are you saying it?

8      Q     Because I'm asking the questions.

9      A     No.  I taught my class.

10     Q     That's all you have to say.

11     A     You don't need to stand to teach a

12  class.

13     Q     Okay.  How would you rate yourself

14  as a teacher?

15     A     I'm an excellent teacher.

16     Q     Were you always an excellent

17  teacher?

18     A     Always an excellent teacher.

19     Q     From 1990 to the point when you

20  retired?

21     A     I repeat, I'm an excellent

22  teacher.

101

1        A     Okay?

2        Q     Do you feel that during that

3    school year understanding that you can't

4    specifically recall whether you feel that you

5    merited an exceeds expectations, do you feel

6    that based on your abilities that you could

7    have received an exceeds expectations?

8        A     I can't say until I check my

9    documentation.

10       Q     Okay.  Do you feel that you had

11    the potential to get an exceeds expectations?

12       A     I always have potential.

13       Q     Okay.     To get an exceeds

14    expectations?

15       A     Always.    I told you, I'm an

16    excellent teacher.

17       Q     Okay.    I'm going to show you

18    what's been marked as Exhibit 7.

19                    (Whereupon, the document

20                    was marked as Gordon

21                    E x h i b i t  7  f o r

22                    identification.)

106

1   medical condition?

2       A    Correct.

3       Q    Okay.    And    that    would    be

4   arthritis?

5       A    Correct.

6       Q    Okay.   So  despite  having  that

7   medical condition and using the cane to walk,

8   you were still able to perform at a very high

9   level that year, right?

10      A    That's -- that's true.

11      Q    Okay.  Okay.  Ms. Gordon, can you

12  tell me, how often would you have to use the

13  copy machine?

14           MR. GOLDMAN:  What period of time?

15           BY MR. BRUCKHEIM:

16      Q    From 2000/2001 school year to the

17  point you retired.

18      A    Okay.   As  I  said,  each  student

19  receives a packet --

20      Q    Right.

21      A    -- with this in it, right?  That's

22  when they first come in my -- come into my

108

1        Q      Okay.

2        A      It depend on what year you're

3   talking about.

4        Q      From --

5        A      Still talking about 2001?

6        Q      Yes, from here on out, the time

7   periods I'll be talking about, unless I say

8   otherwise, will be 2000/2001 school year.

9        A      Would you excuse me?  My legs are

10   bothering me.

11          MR. GOLDMAN:  Can we go off the

12   record for about five minutes?

13          MR. BRUCKHEIM:  Sure.  Of course.

14   You want to take a quick break?

15          MR. GOLDMAN:  Yes.

16          THE WITNESS:  It's getting kind of

17   chilly in here.

18          (Whereupon, at 11:43 a.m. off the

19   record until 11:58 a.m.)

20          BY MR. BRUCKHEIM:

21        Q      Okay.  Ms. Gordon, my next

22   question to you is you've never been arrested

109

1    before, is that correct?

2        A    No.

3        Q    Okay.  I am now going to show you

4    what has been marked as Exhibit 9.

5                        (Whereupon, the document

6                        was   marked   as   Gordon

7                        E x h i b i t   9   f o r

8                        identification.)

9        MR. GOLDMAN:  Excuse me.  Did you

10   skip 8 for a reason?  What was 8, Michael?

11       MR.  BRUCKHEIM:    Eight  was  the

12   letter from Dr. Bridges.

13       MR.  GOLDMAN:  Okay.  Okay.  I'm

14   sorry.

15       MR. BRUCKHEIM:  That's okay.

16       MR. GOLDMAN:  My error.

17       MR. BRUCKHEIM:  Not a problem.

18       MR. GOLDMAN:  Okay.

19       MR. BRUCKHEIM:  All right.  She's

20   got No. 9.

21       MR. GOLDMAN:  Okay.  Apologize for

     any inconvenience.

110

1             MR. BRUCKHEIM:  Sure.

2             MR. GOLDMAN:  No, I just thought

3    --

4             BY MR. BRUCKHEIM:

5        Q    Okay.  And I'd ask, Ms. Gordon, if

6    you could take a look at this.  And when

7    you're doing, just tell what this document is.

8        A    I  believe  this  is  the  EEOC

9    document.

10            MR. GOLDMAN:  Let me take a look.

11            BY MR. BRUCKHEIM:

12       Q    Well, you can tell me if you

13   recognize --

14       A    The Office of Human Rights.  Okay.

15       Q    Okay.  This is the complaint that

16   you filed with the EEOC, the Equal Employment

17   Opportunity Commission, is that correct?

18       A    Yes.

19       Q    Okay.  And at the bottom of the

20   first page --

21            MR. GOLDMAN:  Okay.  Go ahead.

22            MR.  BRUCKHEIM:    Oh,  are  you

111

1    looking at it?

2              MR. GOLDMAN:  No, I'm just looking

3    at -- no sweat.  No problem.

4              BY MR. BRUCKHEIM:

5        Q    Okay.  At the bottom of the first

6    page, Ms. Gordon, is that your signature?

7        A    Yes.

8        Q    Okay.    And  that's  dated  April

9    18th, 2003?

10       A    Yes.

11       Q    Okay.   And  that's  the  signature

12   that you signed declaring under penalty of

13   perjury that the forgoing is true and correct.

14   Is that what that says?

15       A    Yes.

16       Q    Okay.  So that represents that the

17   charges that are listed and the allegations

18   that are listed in this complaint that you

19   filed, you swore under penalty of perjury that

20   it is true and correct, is that right?

21       A    Yes.

22       Q    Okay.  Would you say that this was

112

1    a  thorough  complaint  that  listed  your

2    grievances against D.C. Public Schools?

3        A    Whether it was a what, thorough?

4        Q    Was  it thorough?  Did it list all

5    the problems that you had?

6            MR. GOLDMAN:  I'm going to object

7    because there is limited jurisdiction in the

8    complaint she filed.  You can only file a

9    certain  type  of  complaint  in  that

10   jurisdiction.

11           So  if you want to rephrase your

12   question to reflect that --

13           MR. BRUCKHEIM:  Okay.  I'll --

14           MR. GOLDMAN:  I mean, there may be

15   other issues --

16           MR. BRUCKHEIM:  I'll rephrase it.

17           MR.  GOLDMAN:    --  that  are

18   extraneous to this proceeding.

19           BY MR. BRUCKHEIM:

20       Q    Okay.  Under Roman numeral I, you

21   stated that during the period extending from

22   1999  to  2002,  you  requested  and  you  were

114

1        Q      Okay.   So whatever those other

2   accommodations that you claim you were denied

3   may have been, they do not appear in this

4   complaint in writing, is that correct?

5        A      That's correct.

6        Q      Okay.   And you never filed an

7   amendment to this complaint, is that correct?

8        A      Oh, I'm sorry.  No.

9        Q      You did not?

10       A      No.

11       Q      Okay.   And it's your testimony

12  that this complaint is a true and accurate

13  description of the problems that you had with

14  Ballou High School with respect to the denial

15  of these reasonable accommodations that you

16  requested?

17       A      As a -- again, I said these were a

18  few of the accommodations.

19       Q      Okay.  Well, I understand that you

20  listed --

21       A      I didn't list everything.

22       Q      Okay.  But as to the ones that you

1    absent without leave status?  What does it

2    mean?

3         A    That I'm absent and won't get paid

4    for being absent and will not be on the

5    payroll.

6         Q    If you have leave, would you still

7    get paid?

8         A    If I have leave, would I --

9         Q    I'll rephrase.  If you were out on

10   leave, be it sick leave or annual leave, you

11   would still receive a pay check, correct?

12        A    Right.

13        Q    Okay.  So is it fair to say that

14   when you are absent without leave, it means

15   you are absent from work and you no longer

16   have any leave?

17        A    Well, at that time I was -- I had

18   a Sick Leave Bank -- I was on the Sick -- Sick

19   Leave Bank for that time.

20        Q    Okay.  And did that run out?

21        A    It ran out.

22        Q    And once it ran out, you were

122

absent without leave, is that correct?

A    Yes, you might say that.  Yes.

Q    And when you are on absent without leave status, you do not receive a pay check because you have no more leave left to use?

MR. GOLDMAN:  I'm going to object to one thing.  I want clarification, counsel. Is this a general question or is this time-specific?

THE WITNESS:  Yes.

MR. GOLDMAN:  Are you asking a general question about if you don't -- in general, or are you asking about a particular year?

MR. BRUCKHEIM:  It's a general question.

MR. GOLDMAN:  It's a general question?  Okay.  You can answer it generally.

MR. BRUCKHEIM:  In general.

MR. GOLDMAN:  There may be a difference here.

You want to repeat the question?

1          MR. GOLDMAN:  Forward?

2          THE WITNESS:  Two-thousand --

3          MR. GOLDMAN:  And are we talking

4    about an exit that's locked or unlocked?

5    Could you be clearer, a little bit, please?

6          BY MR. BRUCKHEIM:

7     Q    Again, it's a simple question.  Do

8    you recall during any emergency procedure at

9    the school, be it a fire drill or any actual

10   emergency, were you ever unable to exit the

11   classroom with the rest of the students?

12    A    No.

13    Q    So there was a way out?

14    A    Fortunately, I was out and retired

15   at the time that the fire happened in the

16   auditorium, which was across from my

17   classroom.

18    Q    Okay.

19    A    And I was -- I was -- that would

20   have been a problem there.

21    Q    I understand.

22    A    Okay.

186

1      A     I'm reading.

2      Q     So that's your allegation in your

3  complaint?

4      A     He said -- okay.  Hold on.  I'm

5  not sure.

6      Q     Well, it's --

7      A     I know it is.

8      Q     I'm asking you to confirm what's

9  in your complaint.

10     A     Okay.  In the -- this complaint?

11  Okay.  Let me confirm.  That's correct.

12     Q     Okay.  And then your next sentence

13  you state, "Moreover, from late October 2002

14  to the present time, Respondent continuously

15  denied me a reasonable accommodation by

16  refusing to permit me to return to work since

17  late 10/02 even though I am fully qualified to

18  perform my essential job functions."  Is that

19  correct?

20     A     That's correct.

21     Q     And that is a true statement?

22     A     Yes, sir.

187

1          Q     Okay.  And you had testified that

2     you'd never received anything in writing

3     notifying you that you were not permitted to

4     return to work at Ballou for that time period,

5     correct?

6          A     Not in writing, but I --

7          Q     I understand.

8          A     Not in writing.

9          Q     Okay.  And you've also testified

10    that you don't have any documents that you

11    wrote to Dr. Bridges or anybody above him

12    claiming that you were being barred from

13    returning to work at Ballou during that time

14    period?

15         A     Dr. Bridges said he did not want

16    me at Ballou.  So why would he send me

17    memorandums or letters telling me to come back

18    to Ballou?

19         Q     I'm asking, after hearing this, if

20    you wrote a letter to Dr. Bridges or to his

21    superiors saying I want to come back to work

22    at Ballou.  I've been medically clear to

188

1    return to work, but Dr. Bridges won't let me.

2    Please help me.  Did you ever send a memo like

3    that to anyone during this time period in the

4    fall of 2002?

5         A    No.  In fact, I said the very same

6    words to Dr. Bridges about coming back and why

7    was I excluded from coming back to Ballou.

8         Q    Okay.  Over the phone?

9         A    Yes.

10        Q    Okay.  So did you attempt to come

11   back to work after your sick leave concluded

12   in October of 2002?

13        A    No.

14        Q    Did you --

15        A    You said did I attempt to come

16   back?

17        Q    Yes.  Why not just show up for

18   work?

19        A    He had someone else there.  He had

20   hired someone else.

21        Q    He hired somebody else?

22        A    Someone else was there in my room

189

1    teaching art.

2         Q     Do you know who?

3         A     I had no -- I -- I have -- don't

4    have a clue.  But I was told -- I was told --

5         Q     You were told?

6         A     -- from the office, yes, that

7    someone is there and he told me he didn't want

8    me there.

9         Q     You were told that there was a

10   substitute there?

11        A     I didn't say substitute.

12        Q     Would you have expected that

13   during the time while you were out on sick

14   leave that another teacher would have been

15   obtained in order to fill your spot while you

16   were out?

17        A     At that time or from the time

18   period you're talking about, yes.  Since I

19   told him I would be back in August -- I told

20   him I would be back in September, yes, he

21   would need a substitute for a short period of

22   time.  But during the time that I was

1    contacting him, he had -- he -- he said he

2    didn't want me there, that he was going to

3    transfer me, he was going downtown to get --

4    to fill out the transfer papers and feeling

5    that he didn't want me there and he had more

6    power than I did, I did not know.  I didn't

7    write any memos.

8         Q    Okay.

9         A    No.  That's what he wanted.

10        Q    And you never just showed up for

11   work when you were done with your sick leave,

12   just walk in through the door and say I'm here

13   for work?

14        A    When he said I don't want you

15   there, don't come in?

16        Q    Yes.

17        A    That I'm -- no.

18        Q    You never did that?

19        A    No, I did not.

20        Q    Okay.  In your request for your

21   sick leave you had stated that you were going

22   to undergo extensive physical therapy in

1   August and September of 2002?  Is that right?

2   And again, I'm basing this on what you allege

3   in your complaint in Exhibit 9.

4        A    Okay.  September I contacted Dr.

5   Bridges by phone to request what was my

6   teacher status.  This was after he had said

7   that I was a liability.  Sit tight.  I'm going

8   to transfer you to another school.  Okay?  And

9   I'll notify you as to where you're going,

10  whether it's elementary or secondary.

11       Q    Okay.

12       A    All right?

13       Q    Ms. Gordon,  I'm  sorry  to

14  interrupt.  I'm not asking a question about

15  what Dr. Bridges said?

16       A    What are you asking?

17       Q    I'm asking a question about the

18  therapy that you received while you were out,

19  the reason why you had initially requested

20  sick leave to be out for that period of time

21  from September 2002 until late October of

22  2002.

1        A    -- her response led me to believe

2   that it wouldn't be any use in -- in doing

3   that.  That was her -- her response.

4        Q    Okay.

5        A    But I first went initially through

6   her.

7        Q    For the time period in 2002,

8   beginning of 2002/2003 school year up until

9   the point that you were placed on leave

10  without pay status, you were on sick leave, is

11  that correct?

12       A    When I was not at Ballou?

13       Q    Yes.

14       A    Is that what you're saying?

15       Q    In 2002 to 2003, prior to the time

16  that you were placed on leave without pay

17  status you were on sick leave, is that

18  correct?

19       A    Sick Leave Bank, yes.

20       Q    Okay.

21       A    Yes.

22       Q    Okay.  And when your therapy

205

1      A      I didn't know what Dr. Bridges was

2   putting me on until I saw my pay stub.  Okay?

3   That's an honest answer.

4      Q      Okay.  So you're not sure?

5      A      I -- when I saw my pay stub, he

6   had put me on sick leave.  All right?

7      Q      Okay.

8      A      That's your -- that's the answer.

9      Q      So you were receiving pay checks

10  during that time between October 2002 up until

11  the time you were placed on leave without pay

12  status?  You were still getting paid, correct?

13     A      Correct.

14     Q      Okay.  Now, I'm going to show you

15  what's been marked as Exhibit 14.

16          MR. BRUCKHEIM:

17                  (Whereupon, the document

18                  was    marked    as    Gordon

19                  E x h i b i t    1 4    f o r

20                  identification.)

21          BY MR. BRUCKHEIM:

22     Q      I'd ask you to take a look at that

206

1    and tell me if you recognize that letter?

2         A    Okay.

3         Q    Do you recognize this letter?

4         A    Sure.

5         Q    Okay.

6         A    Yes.

7         Q    This is a letter dated February

8    26th, 2003 addressed to you, signed from

9    principal Dr. Bridges.  Is this the letter

10   that you were talking about before that

11   informed you that you were on leave without

12   pay since February 3rd, 2003?

13        A    Yes.

14        Q    Okay.  And this letter informed

15   you that being absent without leave is grounds

16   for disciplinary proceedings, is that correct?

17        A    Yes.

18        Q    Okay.  And in the third paragraph

19   of this letter you were directed to report for

20   duty by 8:30 a.m. on Monday March 10th, 2003,

21   is that correct?

22        A    That's correct.

207

1      Q    Okay.  And you were told to notify

2  him if you couldn't report due to your being

3  physically incapacitated, is that correct?

4      A    That's right.

5      Q    Okay.  And you did not show up for

6  work by March 10th, 2003, is that correct?

7      A    (No audible response.)

8      Q    Okay.  So this letter directed you

9  to report to work and you did not do so,

10  correct?

11      A    Excuse me?

12      Q    That's correct?

13      A    Oh, excuse me.  That's correct.

14      Q    Okay.  And you have testified that

15  after finishing your physical therapy in

16  October of 2002 you wanted to come back to

17  work but Dr. Bridges told you not to, is that

18  correct?

19      A    That's it.

20      Q    And now we have a letter from Dr.

21  Bridges, Exhibit 14, in which he told you to

22  come back to work by March 10th, but you did

208

1    not do so, correct?

2        A    Yes.

3        Q    Okay. Now I'm going to show you

4    Exhibit 15.

5                    (Whereupon, the document

6                    was   marked   as   Gordon

7                    E x h i b i t    1 5    f o r

8                    identification.)

9        BY MR. BRUCKHEIM:

10       Q    I'll  note  this  letter  is  not

11   signed by you, so I'd ask that you review the

12   letter and see if that is an accurate copy of

13   a letter which you did send to Dr. Bridges on

14   that date.

15       A    Yes.

16       Q    This  is  an  accurate  copy  of  a

17   letter you sent to Dr. Bridges dated March

18   3rd, 2003?

19       A    That's correct.

20       Q    Okay.  In  this  letter  you  did

21   mention that your room is very cold due to the

22   lack  of  heat,  is  that  correct?    And  I'm

217

1    this doctor's last name?

2        A    you know what?  I always call him

3    Dr. Emmanuel because I can never pronounce his

4    last name?

5        A    Dr. Emmanuel?  Okay.  That's how

6    I'll refer to him.

7        MR.  BRUCKHEIM:      Madam   court

8    reporter, for the record, his last name is

9    spelled M-B-U-A-L-U-N-G-U.

10           BY MR. BRUCKHEIM:

11       Q    And, Ms. Gordon, this is a letter

12   that's dated March 7th, 2003, is that correct?

13       A    Yes.

14       Q    And in this letter Dr. Emmanuel

15   states that you have been released to return

16   to work with certain limitations, correct?

17       A    Yes.

18       Q    And specifically those limitations

19   are  decreased  standing  and  walking  time,

20   correct?

21       A    That's correct.

22       Q    Okay.  So as of March 7th, 2003,

229

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

IN THE MATTER OF:

MURIELENE GORDON,

      Plaintiff,

                  Civil No. 05-1907-EGS

v.                Judge Emmett G. Sullivan

Magistrate
John M. Facciola
DISTRICT OF COLUMBIA
PUBLIC SCHOOLS,

      Defendant.

Monday,
July 17, 2006

Washington, D.C.

DEPOSITION OF:

MURIELENE GORDON

called for examination by Counsel for the Defendant,

District of Columbia Public Schools, pursuant to

agreement, in the office of Charles Goldman, located

at 1155 15th Street, Northwest, Suite 1004, when were

present on behalf of the respective parties:

230

APPEARANCES:

On Behalf of Plaintiff, Murielene Gordon:

CHARLES GOLDMAN, ESQ.
1155 15th Street, NW
Suite 1004
Washington, DC 20005
(202)466-7550
(202)467-5085 fax


On Behalf of the District of Columbia Public
Schools:

MICHAEL P. BRUCKHEIM, ESQ.
of:   Office of the Attorney General
441 4th Street, NW
Sixth Floor - South
Washington, DC 20001
(202) 724-6649
(202) 727-3625 fax

233

1    to work.  And if I cover some questions that we may

2    have asked before, please forgive me.  I have an idea

3    where  we  left  off,  but  I  may  need  to  ask  a  few

4    questions just to get us rolling again.

5                    DIRECT EXAMINATION

6              BY MR. BRUCKHEIM:

7         Q    Do  you  recall  receiving  that  letter,

8    that's Exhibit 19?

9         A    Yes.

10        Q    Okay.  When you received that letter, did

11   you return to work in the 2002-2003 school year, after

12   you received that letter from Ms. Jones?

13        A    2003 school year?

14        Q    It  would  be  2002-2003  school  year,  which

15   means you would have returned to work either in April,

16   or May, or June of 2003.

17        A    No.

18        Q    You did not.

19        A    No.

20        Q    Why  didn't  you  return  to  work  after

21   receiving  that  letter  telling  you  that  you  were

22   cleared to return to work?

236

1    accommodations.

2              MR. GOLDMAN:  Asked and answered.  Go on.

3              MR. BRUCKHEIM:  It has been asked, it has

4    not been answered.

5              MR. GOLDMAN:  It has been asked and

6    answered.  She said she wrote letters before.  If you

7    have a specific period which you want to ask her if

8    she wrote a letter, ask the question that way.

9              MR. BRUCKHEIM:  Okay.

10             BY MR. BRUCKHEIM:

11        Q    If you submit □-

12             MR. GOLDMAN:  If you wrote a letter □-

13             MR. BRUCKHEIM:  I'm going to ask her a

14   question, counsel.  Thank you.

15             MR. GOLDMAN:  Okay.

16             BY MR. BRUCKHEIM:

17        Q    Did you submit any written request for

18   accommodations prior to □- let me rephrase that.

19             Did you submit any written request for

20   accommodations for the 2002-2003 school year in June

21   of 2002?

22        A    June 2002?

237

1          Q     Yes.

2                MR. GOLDMAN:  I don't have any objection

3    to that question.

4                THE WITNESS:  Okay, 2002.

5                BY MR. BRUCKHEIM:

6          Q     If you recall.

7          A     If I recall.

8          Q     Could I ask what you're looking at, Ms.

9    Gordon?

10         A     I'm looking at my personal log, as far as

11   everything, because dates and stuff I have to put

12   down.  But it's everything you have.  Let me see,

13   2002?

14               MR. GOLDMAN:  June of 2002.

15               THE WITNESS:  Specific, okay.  As far as

16   June 2002, no, I did not have it listed.

17               BY MR. BRUCKHEIM:

18         Q     Okay.  How about July of 2002?

19         A     Now this is to Dr. Bridges.  Is that

20   correct?

21         Q     Yes.  This is any written requests for

22   accommodations prior to your returning to teach for

1    exit doors in my classroom to get out, but I went out

2    - the kids helped me out, and we went out through the

3    front door.

4          Q     Okay.  Do you recall when this was?

5          A     No, but I put the clipping in my files.

6          Q     It was in the newspaper?

7          A     Right.

8          Q     Okay.  Do you recall if it was before or

9    after 2000?

10          A     I can't recall right now.

11          Q     Okay.  Ms. Gordon, I think I asked you

12    this.  I'm going to ask you a bunch of questions about

13    your condition, so I'll start just by asking what,

14    again as a base question, what is your alleged

15    disability?

16          A     Alleged?

17          Q     Yes.

18          A     I have degenerative arthritis in both

19    knees, both hips, in my back.  I have high blood

20    pressure.  I have a thyroid condition.

21          Q     Okay.  And that condition makes it

22    difficult for you to walk.  Correct?

299

1          MR. BRUCKHEIM: Yes. I'm sorry about

2    that. When I made my questions, I basically put down

3    everything. I'm trying to siphon out things make it a

4    little more economical, as I know you like to do, too.

5          MR. GOLDMAN: That's fine.

6          BY MR. BRUCKHEIM:

7     Q     Ms. Gordon, back in 2002-2003 school year,

8    during that time period, were you able to drive a

9    vehicle?

10    A     I don't drive.

11    Q     Okay. You don't drive at all?

12    A     No.

13    Q     Did you ever have a license to drive?

14    A     No.

15    Q     No kidding, you've never driven before?

16    A     No.

17    Q     Oh, okay.

18          MR. GOLDMAN: She's the one.

19          MR. BRUCKHEIM: Well, how about that.

20          BY MR. BRUCKHEIM:

21    Q     How would you commute to work every day?

22    A     What year was this?

300

1      Q    We'll say 2001-2002 school year.

2      A    Okay.  You said 2001?

3      Q    Yes.

4           MR. GOLDMAN:  2001-2002 is what he said.

5           MR. BRUCKHEIM:  2001-2002 school year.

6           THE WITNESS:  Okay.  I'm checking to see

7      when I applied for the Metro Access.  That's what I'm

8      looking for.  I think it was □-

9           BY MR. BRUCKHEIM:

10     Q    Let me ask you this.  After you got the

11     Metro Access, would you use Metro Access to commute to

12     work every day?

13     A    Yes.

14     Q    Okay.  How did you commute to work before

15     you applied for Metro Access?

16     A    I caught the regular bus.

17     Q    You took the regular bus?

18     A    Yes.

19     Q    Okay.  Would you have to walk to the bus

20     stop that was closest to your home?

21     A    Yes.

22     Q    Okay.

301

1    A    But it wasn't far.

2    Q    It wasn't far?

3    A    No.

4    Q    About how far was it, would you say?

5    A    About half a block.

6    Q    Oh, that's not far.  How close is the bus

7    stop to Ballou, the one you got off at to go to work?

8    A    That's about a city block.

9    Q    About a city block.  Okay.  And I saw you

10    looking through your notes before.  Are you able to

11    recall when you applied for Metro Access?

12    A    I need this document once again.

13    Q    Okay.  I'll let you get back to that.

14    A    Oh, here it is.  November the 4th.

15    MR. GOLDMAN:  What year?

16    THE WITNESS:  2003.

17    MR. BRUCKHEIM:  Okay.

18    BY MR. BRUCKHEIM:

19    Q    Well, is November 4th, 2003 when you

20    applied for Metro Access?

21    A    Yes.

22    Q    Okay.  And do you know when you were

302

1    granted the use of Metro Access?

2          A      Shortly afterwards.

3          Q      Okay.  By "shortly" would you say within

4    the same month?

5          A      Let's see.

6                 MR. GOLDMAN:  If you know.

7                 THE WITNESS:  You want me to check?

8                 MR. BRUCKHEIM:  Yes, if you can check, if

9    you know.

10                THE WITNESS:  It was January 7th.

11                BY MR. BRUCKHEIM:

12         Q      Okay.  So that would be January 7th of

13   2004?

14         A      Correct.

15         Q      Okay.  So prior to January 7th, 2004, you

16   would commute to work using the normal City Metro bus.

17         A      Yes, sir.

18         Q      Okay.  There's one question that I should

19   have asked you before when I was asking you questions

20   about Dr. Maloney, so I'm going to jump to that really

21   quick, and then get back to the other things we were

22   talking about.  I wanted to ask you whether prior to

303

1    when you began your sessions with Dr. Maloney had you

2    ever sought any kind of psychiatric or counseling

3    treatment prior to that for whatever may have been

4    going on with you at the time?

5         A    Not that I recall.

6         Q    Okay.  The next batch of questions I'm

7    going to ask you, I'm trying to get an idea of things

8    that you are able to do, and things that you are not

9    able to do.  Some of these questions may be sort of

10   simple, and perhaps even almost ridiculous on their

11   face, but they're questions that I need to ask to get

12   an idea kind of legally where you stand, so I

13   apologize in advance.  I'm just going to kind of go

14   through them just to ask about things that you're able

15   to do, not to do.

16              I'll tell you, actually what I'm most

17   interested in right now are just things that you're

18   able to do and not do around your house, and with

19   respect to your house.

20              In the morning, do you require any

21   assistance to get dressed or to bathe yourself in any

22   way?

304

1         A    No.

2         Q    Okay.  With respect to household chores,

3    are you able to pick things up around the house; in

4    other words, if there's a mess on the floor for

5    whatever reason, are you able to clean that up, or is

6    that something your grandson would be recruited to do?

7              MR. GOLDMAN:  The word "recruited" in

8    quotes.

9              THE WITNESS:  Do you have any children at

10   home?

11             MR. BRUCKHEIM:  Yes.  I totally sympathize

12   with the cleaning up issues.  I'm asking if it's

13   something that you would be able to do yourself.

14             THE WITNESS:  Pick up things, you said?

15             MR. BRUCKHEIM:  Yes, like from the floor.

16    Let's say you're in □-

17             THE WITNESS:  I have something that I

18   received from National Rehab.  It's one of those

19   extension things, apparatus where you don't have to

20   bend down to pick up stuff.

21             MR. BRUCKHEIM:  Okay.

22             THE WITNESS:  It picks it up for you.

329

1          Q     Okay.   In answer to this interrogatory,

2     you stated you could perform the essential duties of

3     your job with reasonable accommodations you requested

4     but were denied.   And then you go on to say that you

5     couldn't carry materials, or reach supplies, or climb

6     stairs to meetings.   Is that correct?

7          A     That's correct.

8          Q     Okay.   Back in 2002-2003, that was the

9     time period you were commuting by Metro bus.   Is that

10     correct?

11          A     Yes.

12          Q     And to get to work each day, you would

13     have to go down the steps contained in your house, and

14     then go down the steps that were outside your house in

15     order to get to the sidewalk.   Is that right?

16          A     That's correct.

17          Q     And then you would walk □-

18          A     With the help of a cane.

19          Q     With the help of a cane.

20          A     Yes.

21          Q     Okay.   In this interrogatory you also

22     stated that your room was too cold, which adversely

393

1      Q    All right.  Okay.  Did you know if Dr.

2  Bridges ever retaliated against any other teacher at

3  Ballou in 2002-2003, were you aware of him ever

4  retaliating against other teachers or other members of

5  the staff?

6              MR. BRUCKHEIM:  Objection on relevance,

7  calls for legal conclusion.

8              MR. GOLDMAN:  Okay.  Fair enough.  I'm

9  trying to cut through.

10             BY MR. GORDON:

11     Q    In 2002-2003, were you aware of any other

12  teachers with problems with Dr. Bridges, teachers or

13  faculty, members of the staff - excuse me.  Let me

14  make it easier.

15     A    Well, I don't know whether that was the

16  period which it was done, yes.  But when there was one

17  young man, I know that he really was □- he was

18  horrible to this gentleman.  He was demeaning, he

19  would call him over the PA system and call him names.

20   He would call him to the office, and the man would

21  come back to my classroom in tears sometime.  Then

22  there was a counselor, she complained of mold in her

394

1    office.    She  had  a  health  problem,  and  then  she

2    complained  also  about  □-  she  was  handicapped,  she  was

3    disabled,  and  he  fought  her  on  handicap  space.    He

4    didn't  want  to  give  her  a  handicapped  space  in  the

5    parking  lot,  so  there  was  constant  back  and  forth  with

6    her.    There  may  have  been  others,  but  I  can't  think

7    right  now  off  the  top  of  my  head.

8           Q     Was  this  part  of  your  thinking  in  the

9    summer  of  2002-2003,  getting  ready  for  the  2002-2003,

10   did  you  have  this  in  mind  at  any  time  across  that

11   summer,  Dr.  Bridges'  previous  acts  to  these  other

12   people?

13          A     It  came  to  mind,  yes.    I  knew  what  he  was

14   capable  of  doing  to  other  people,  yes.

15          Q     Okay.    In  that  same  period  of  time,  was

16   standing  a  problem  for  you,  for  more  than  a  few

17   minutes?

18          A     Yes.

19          Q     Okay.    Is  it  still  a  problem?

20          A     It's  still  a  problem.

21          Q     Had  been  a  problem  for  years?

22          A     Yes.